**WILLIAMSBURG WAX MUSEUM, INC., Plaintiff,**

v.

**HISTORIC FIGURES, INC., et al., Defendants.**

**NATIONAL CIVIL WAR WAX MUSEUM, INC., Plaintiff,**

v.

**HISTORIC FIGURES, INC., et al., Defendants.**

**NATIONAL SOUVENIR CENTER, INC., et al., Plaintiffs,**

v.

**HISTORIC FIGURES, INC., et al., Defendants.**

**Civ. A. Nos. 77–0093, 77–0131 and 77–1243.**

United States District Court, District of Columbia.

Dec. 23, 1982.

Jerome S. Wagshal, Nelson Deckelbaum, Washington, D.C., for plaintiffs.

James C. McKay, John S. Koch, David J. Cynamon, Covington & Burling, Washington, D.C., for defendants.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

Plaintiffs in these consolidated antitrust cases are three wax museums owned in common by C.M. Uberman Enterprises, Inc. since 1973. Each museum came into being in the 1960's by means of a "franchise agreement" with defendant National Historic Museum, Inc., the wholly owned subsidiary of Historic Figures, Inc. Plaintiffs challenge these contracts as illegal tying arrangements. They contend that the defendants acted in concert illegally to condition the sale or lease[1] of Lynch's display figures on the purchase by plaintiffs of National's franchise agreements.[2] The agreements obligated the museums to pay National five percent of their gross admis-

---

1. The figures were sold to Gettysburg (77–0131) and Williamsburg (77–0093). They were leased to Gatlinburg (77–1243). Although the franchise/lease arrangement in Gatlinburg is challenged on a tying theory, the lease is the target of a separate challenge along the lines of a "refusal to sell" such as existed in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

2. Historic Figures, Inc. and National Historical Museum, Inc. had established a wax museum in Washington, D.C. with the help of defendant Dorfman, the founder, president and principal stockholder of defendant Lynch Display Corporation (Lynch). The defendants later bound themselves contractually to package together the sale of the Lynch figures and the "franchises" for new wax museums.

sions receipts for twenty years[3] in exchange for National's promise to provide certain services and to refrain from establishing competing museums in nearby locations.[4] Plaintiffs survived a previous motion for summary judgment in which defendants maintained that no tying violation could have occurred because each contract involved only one product, the establishment of a wax museum. The Court held that whether the contracts covered one or two products was a material question of fact inappropriate for summary disposition. Now defendants have moved for summary judgment in two cases and partial summary judgment in the third[5] on the ground that insofar as a tying violation is alleged, it is barred by the Clayton Act's four-year statute of limitations, 15 U.S.C. § 15b.[6] As the contracts that underlie plaintiffs' claims were admittedly executed well over four years before plaintiffs filed their complaints in 1977,[7] the question for decision is whether plaintiffs may invoke one of the judicially-crafted exceptions to Section 15b. After careful consideration of the parties' pleadings and their presentations at oral argument, the Court finds that no exception is applicable. Defendants' motion will therefore be granted.

The two exceptions to which plaintiffs point[8] are not really exceptions at all, but they are actually constructions of what it means for a private antitrust action to "accrue." Under the first of these two constructions, a new cause of action accrues "whenever the defendant commits an overt act in furtherance of an antitrust conspiracy or, in the absence of an antitrust conspiracy, commits an act that by its very nature is a continuing antitrust violation." *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1051 (5th Cir.1982) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338–40, 91 S.Ct. 795, 806–07, 28 L.Ed.2d 77 (1971) and *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 501 n. 15, 88 S.Ct. 2224, 2235 n. 15, 20 L.Ed.2d 1231 (1968) ).[9] Thus, no matter how long ago the initial antitrust violation occurred, the action will not be time-barred by § 15b "if defendant committed further overt acts or continuing violations which injure plaintiff's business during the limitations period." *Electroglas, Inc. v. Dynatex Corp.,* 497 F.Supp. 97, 104 (N.D.Cal.1980). The second construction is more concerned with the effects of a defendant's allegedly illegal act. It allows that act to be " 'revived' outside the limitations period as a basis for damages, because when the act originally occurred, plaintiff's damages were speculative or unprovable." *Kaiser Aluminum, supra,* 677 F.2d at 1051. This theory also derives from *Zenith, supra.*

In an effort to bring themselves within the first theory, plaintiffs have pointed to

---

3. In addition, the Williamsburg museum agreed to pay National at a rate of $2\frac{1}{2}$ percent for every year of operation past twenty years.

4. The first franchise agreement states that the percentage payments are "in consideration of the unique figures and services to be performed by National." The second and third agreements refer only to services, presumably because the Gatlinburg museum contracted separately to lease the figures directly from Lynch and the Williamsburg museum contracted to buy them from Lynch.

5. Plaintiffs' claim that the Gatlinburg lease was a refusal to sell and an unlawful exercise of monopoly power is unaffected by the instant motion. See note 1, *supra.*

6. Section 4B of the Clayton Act, 15 U.S.C. § 15b, provides:

> Any action to enforce any cause of action under sections 15 or 15a of this title shall be forever barred unless commenced within four years after the cause of action accrued.

Plaintiffs brought these actions under the treble damage provision of Section 15.

7. The Gettysburg contract was executed September 22, 1960. The Gatlinburg contract was executed May 31, 1962. The Williamsburg contract was executed September 22, 1967.

8. Plaintiffs do not invoke the exceptions triggered by a defendant's fraudulent concealment or by the prior initiation of a government antitrust action.

9. In *Zenith,* a conspiracy was alleged and proved. *Hanover* involved no conspiracy but rather the unlawful exercise of monopoly power.

the continuing payments they made to National, to National's occasional demands for payment, to National's continuing obligation to be available should plaintiffs request its services, and to defendants' general "involvement" with plaintiffs' businesses as evidence that "overt acts or continuing violations" occurred between 1973 and 1977. When asked to explain the antitrust injury occasioned by these alleged overt acts or continuing violations, however, plaintiffs' counsel answered,

> [T]hese plaintiffs were diminished in their business and property.... [They] had to shell out money they would not have wanted to shell out if that franchise had not been tied to the sale of the figures.... [T]he money is being paid ... and there is the antitrust violation.

However, as two federal courts have observed, "the harm that creates the new cause of action must be '*antitrust* harm, *i.e.,* a continuing injury to *competition,* not merely a continuing pecuniary injury to a plaintiff.'" *Kaiser Aluminum, supra,* 677 F.2d at 1055 (quoting *Electroglas, Inc., supra,* 497 F.Supp. at 105) (emphasis in original). If the law were otherwise, the statute of limitations would have little force whenever a contract allegedly executed in violation of the antitrust laws provided for long-term payments: there would be no repose until four years after the last installment payment. This could be years after the original tainted bargain was struck. In all likelihood, some witnesses would be unavailable.[10] In any event, the case would be characterized by exactly that sort of staleness which it is the object of a statute of limitations to prevent.[11]

A brief description of the parties' relationship during the years 1973 to 1977 suffices to show the accuracy of counsel's concession that his clients suffered only pecuniary injury, not anticompetitive injury, within the limitations period. By 1973 the museums had been operating for some time, displaying the Lynch figures obtained in the 1960's and paying franchise fees to National on a quarterly basis. National was still obligated to remain available to perform additional services upon plaintiffs' request, and to refrain from establishing competing museums, but plaintiffs were under no obligation to buy services from National or from any defendant. Plaintiffs' pleadings blame defendants for not providing enough service to warrant the franchise fees[12] at the same time that they criticize them for exercising too much involvement in plaintiffs' businesses.[13] In any event, National was paid extra sums for the later services it provided.[14] It is the law of these cases that the parties intended any post start-up services to be paid for separately, over and above the ongoing franchise fees. Memorandum Order of May 19, 1981, at 3. Thus, plaintiffs were free to turn to other

---

**10.** This is the case in the instant actions. For instance, three of the five principals involved in the Gettysburg franchise are deceased.

**11.** Cases cited by plaintiffs such as *Fitzgerald v. Seamans,* 553 F.2d 220 (D.C.Cir.1977), are not to the contrary. There are no cases that instruct courts to disregard the Clayton Act's statute of limitations simply because of the "strong congressional policy in favor of antitrust enforcement by private damages suits." *Fitzgerald, supra,* 553 F.2d at 227. The dicta to which plaintiffs refer in *Fitzgerald* was limited to the speculative damages exception which, for reasons elaborated upon below, is inapplicable to these cases.

**12.** The first Uberman affidavit states that from 1973 to 1975 Uberman requested assistance from National, particularly in connection with the museums' advertising campaigns, but that assistance was not forthcoming.

**13.** The second Uberman affidavit, filed in conjunction with plaintiffs' supplemental reply memorandum, refers to numerous phone bills that allegedly show Dorfman's continued involvement with the museums after 1973. The memorandum and affidavit failed to mention how telephone calls and visits by Dorfman, the owner of Lynch and a minority stockholder in the Gettysburg museum could amount to acts causing antitrust injury to plaintiffs.

**14.** Most of the services anticipated by the agreements were start-up services. The parties dispute what percentage of the franchise payments is allocable to National's future "availability." They also dispute the value of the services provided by National at the time each museum opened. This haggling resembles a breach of contract controversy more than an antitrust violation.

sellers of comparable services; they were not locked into purchasing them from National. There is no evidence that plaintiffs ever attempted to buy services elsewhere nor that they were foreclosed from doing so by some act of defendants. Plaintiffs can point to no act within the limitations period by which any of the defendants affected plaintiffs' competitive standing either as sellers or buyers. All they can complain of is their ongoing commitment to National to pay five percent of the annual gross receipts and the occasional demands of defendants regarding that obligation. These are simply "the abatable, but unabated inertial consequences of some pre-limitations action." *Poster Exchange, Inc. v. National Screen Service Corp.,* 517 F.2d 117, 128 (5th Cir.1975).

A defendant's continuing receipt of benefits under an illegal pre-limitations contract may, in certain circumstances, prevent plaintiff's case from being time-barred. This doctrine was discussed in *Kaiser Aluminum, supra,* the Fifth Circuit's most recent pronouncement on the application of § 15b to cases involving long-term payments. In *Kaiser,* the court held that the "continued receipt of contract payments" could work a tolling of § 15b only where damages would have been speculative or unprovable within four years of the initial antitrust violation. The *Kaiser* panel thus incorporated the *Zenith* speculative damages exception, and made it clear that its earlier holding in *Imperial Point Colonnades Condominium, Inc. v. Mangurian,* 549 F.2d 1029 (5th Cir.1977), hinged on the fact that "damages ... were not ascertainable at the time of the execution of the contracts ... because the defendants could arbitrarily and unilaterally continue to engage in acts that amounted to overt acts in furtherance of their antitrust conspiracy." 575 F.2d at 523–24.

In its first reply memorandum, filed before *Kaiser,* plaintiffs relied heavily on *Mangurian.* At oral argument, plaintiffs' counsel attempted to fit the cases within the limits imposed by *Kaiser,* arguing that because the franchise fees were not quantified, but were based on gross receipts and therefore would fluctuate depending upon the museums' performance, damages would not have been provable within four years after the contracts were executed. This is incorrect. The percentage had been fixed in the contracts and defendants could not unilaterally change it.

Moreover, a comparison with *Zenith* shows how inappropriate the speculative damages exception would be in these cases. In *Zenith,* a pre-limitations act of defendant had reduced plaintiff's share of the market. The consequences of this reduced share would continue no matter what Zenith or a court did. The Supreme Court therefore held that Zenith's cause of action did not accrue until Zenith's loss could be more accurately measured. In the instant case, any injury plaintiffs suffered was confined to its dealings with National. Presumably damages would be measured by the difference, if any, between the amount plaintiffs paid for the tied product—the franchise services—and the amount they would have paid for comparable services on the open market. A court could have reduced plaintiffs' franchise obligations by this amount, or eliminated them altogether on the theory that the antitrust laws had been violated, at any time subsequent to the execution of the contracts. All plaintiffs had to do was to sue within the limitations period. It was within the power of a court to make plaintiffs whole (unlike the situation in *Zenith,* where external forces would perpetuate and increase the consequences flowing from plaintiff's reduced market share).

Thus, plaintiffs may not take advantage of the "continuing benefits" theory, because they fail to satisfy the speculative damages element, nor can they take advantage of the speculative damages theory standing alone. Plaintiffs' causes of action "accrued" at the time the contracts with National were executed (1960, 1962 and 1967 respectively). No additional cause of action respecting the tying allegations accrued in the four years before plaintiffs filed their

complaints.[15] The allegations based on defendants' alleged tying must therefore be dismissed.[16]

---

**15.** This holding is consistent with, if not compelled by, the Court's previous ruling awarding judgment on defendants' counterclaims. The Court held that defendants could collect unpaid and owing franchise fees from plaintiffs because even if the contracts had been executed pursuant to an illegal tie-in scheme, the contracts and payments thereunder were not in themselves illegal. Memorandum Order of May 19, 1981; Memorandum of September 3, 1982; Order and Final Judgment of September 3, 1982.

**16.** Plaintiffs have presented no reason why the leasing of the figures in Gatlinburg dictates a different result with respect to the claims of illegal tying. The lease ran for twenty years, the same length as the franchise agreements. There is no evidence that the lease was renewed during 1973–1977 or that any other overt act or continuing violation occurred, by virtue of the lease, to distinguish the Gatlinburg case from the two cases where the figures had been purchased. Defendants have not interposed a statute of limitations defense to the allegation that the lease was an unlawful exercise of monopoly power, so this aspect of C.A. 77–1243 is left intact by today's ruling.