**HEMLOCK SEMICONDUCTOR CORPORATION, Plaintiff,**

v.

**DEUTSCHE SOLAR GMBH, f/k/a Deutsche Solar AG, Defendant.**

**Case No. 13–cv–11037.**

United States District Court, E.D. Michigan, Northern Division.

Signed May 7, 2015.

Craig W. Horn, Braun, Kendrick, Saginaw, MI, for Plaintiff.

Anthony Cillo, David F. Russey, Larry K. Elliott, Cohen & Grigsby, P.C., Pittsburgh, PA, Daniel P. Malone, Butzel Long, Detroit, MI, Joseph E. Richotte, Butzel Long, P.C., Bloomfield Hills, MI, for Defendant.

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO STRIKE, STRIKING AFFIRMATIVE DEFENSES, GRANTING IN PART AND DENYING IN PART MOTION TO COMPEL, DIRECTING PRODUCTION, ADJOURNING DISCOVERY CUTOFF, DENYING MOTION FOR LEAVE TO AMEND, AND DIRECTING SUBMISSION OF SCHEDULING PROPOSALS**

THOMAS L. LUDINGTON, District Judge.

Hemlock Semiconductor and Deutsche Solar are each significant actors in the

global solar energy industry. Their immediate dispute arises from a series of contracts for the sale of large quantities of industrial-grade polycrystalline silicon from Hemlock to Deutsche Solar. Following changes in global solar market conditions, Deutsche Solar ceased making polycrystalline silicon purchases under the Supply Agreements with Hemlock, some of which continued until 2019. When Deutsche Solar discontinued making further purchases or payments under the Supply Agreements, Hemlock initiated this suit.

Hemlock filed its complaint on March 7, 2013. The parties engaged in discovery until August 22, 2014, at which point the parties requested a status conference. During the conference, the parties informed the Court of a dispute regarding discovery requests that could potentially relate to a number of Deutsche Solar's affirmative defenses. These defenses, as identified in Deutsche Solar's Answer, are:

6. The Supply Contracts as Plaintiff seeks to enforce them are illegal, and/or the enforcement of the Supply Contracts would make the Court a party to a violation of European Union antitrust law.

. . .

12. Any required performance on the part of Deutsche Solar is excused by the doctrine of commercial impracticability.

13. Any required performance on the part of Deutsche Solar is excused by the doctrine of frustration of purpose.

14. Any required performance on the part of Deutsche Solar is excused by the doctrine of force majeure.

15. Any required performance on the part of Deutsche Solar is excused by the supervening intervention of one or more third parties.

16. Any required performance on the part of Deutsche Solar is excused by the illegal dumping of solar panels by the Chinese Government and Chinese producers, which caused a fundamental disruption in the market that was not foreseen or foreseeable by the parties at the time of their agreements.

Def.'s Answer, ECF No. 14 at 11–12.

Hemlock indicated that it had insufficient information regarding these defenses and would, on that basis, not be making the requested disclosures. As a result, on September 24, 2014, Deutsche Solar filed a Motion to Compel. ECF No. 30. In response, and as contemplated in conference with the Court, Hemlock cross-moved to strike Deutsche Solar's affirmative defenses upon which its discovery requests were predicated. ECF No. 36. Those motions are now before the Court.

## I.

Hemlock Semiconductor, Plaintiff in this action, is a Michigan corporation involved in the manufacture and sale of polycrystalline silicon and photovoltaic solar cells and modules. ECF No. 1 at ¶¶ 2, 3, 7.

Deutsche Solar GmbH, Defendant in this action, is a German limited liability company involved in the production of multicrystalline silicon wafers, "which are the building blocks of photovoltaic solar cells and modules." ECF No. 1 at ¶ 8.

### A.

Hemlock and Deutsche Solar, beginning "[i]n or about August 2005, . . . entered into [four] Long Term Supply Agreement[s], pursuant to which Deutsche Solar agreed to purchase and Hemlock agreed to supply, polycrystalline silicon[.]" ECF No. 1 at ¶ 9. Deutsche Solar agreed to purchase certain defined quantities of polycrystalline silicon in accordance with a schedule outlined in the agreements. *Id.* The parties agree that the effective dates found in the supply agreements are as follows:

The first Long Term Supply Agreement ... is effective from August 30, 2005 to December 31, 2015. The second Long Term Supple Agreement ... is effective from June 10, 2006 to December 31, 2018. The third Long Term Supply Agreement ... is effective from June 27, 2007 to December 31, 2019. The fourth Long Term Supply Agreement ... was effective from January 1, 2010 to December 31, 2012.

ECF No. 1 at ¶ 10.

Hemlock alleges that these agreements took the form of "take or pay" contracts "such that Deutsche Solar is required to pay the full purchase price for [polycrystalline silicon] scheduled to be purchased each year, regardless of whether Deutsche Solar actually takes delivery of the product." ECF No. 1 at ¶ 11. Under this construction of the agreements, "Deutsche Solar's scheduled purchases over the respective terms of the four Supply Agreements totaled 24,390,000 kilograms" of polycrystalline silicon. Id. at ¶ 12.

Deutsche Solar denies that the Supply Agreements were of the "take or pay" type and so also contests the amount of polycrystalline silicon they agreed to take in delivery. ECF No. 14 at ¶¶ 11, 12. According to Deutsche Solar, the parties "subsequently modified the agreements by agreement and by their conduct." Id. at ¶ 10. Hemlock confirms in its motion to strike that "[t]he parties occasionally amended and restated the Supply Agreements between 2008 and 2011." ECF No. 36 at 1.

### B.

In March of 2012, Deutsche Solar communicated with Hemlock that it was no longer comfortable with the pricing terms of the Supply Agreements. The parties disagree as to the interpretation of the two letters, sent by Deutsche Solar's CEO to Hemlock management, attached to Hemlock's complaint as Exhibits 5 & 6. The parties do agree, however, that "Deutsche Solar ... has not purchased any [polycrystalline silicon] from Hemlock since March 31, 2012 and that it has placed no purchase orders for [polycrystalline silicon] with Hemlock." ECF No. 14 at ¶ 18.

On October 12, 2012, Hemlock sent a letter to Deutsche Solar seeking "adequate assurance that Deutsche Solar will fully perform its obligations under its four [Supply Agreements with Hemlock.]" ECF No. 8, Ex. 7. On October 16, 2012, Deutsche Solar responded to Hemlock's letter and stated, among other things, that "Deutsche Solar is committed to fulfill its obligations under the Long Term Supply Agreements as amended from time to time." Id., Ex. 8. In a reply to this letter, Hemlock expressed its belief that Deutsche Solar's assurances were inadequate and that "Deutsche Solar's October 16 response fails to provide the requisite assurances contemplated by MCLA § 440.2609 and applicable Michigan law[.]" Id., Ex. 9.

Five months later, on March 4, 2013, Hemlock issued Deutsche Solar an invoice in the amount of $83,971,500.00, which it believed represented the value of polycrystalline silicon that Deutsche Solar did not purchase during 2012. ECF No. 1 at ¶ 25. Hemlock alleges that "on March 5, 2013, Deutsche Solar responded by letter, formally objected to the invoice, and claimed the Supply Agreements are 'null and void.'" Id.[1] Deutsche Solar admits that Hemlock issued such an invoice and that it "disputed the accuracy and validity of the invoice." ECF No. 14 at ¶ 25.

### II.

A "court may strike from a pleading an insufficient defense or any re-

---

1. A copy of this letter was not attached to Hemlock's complaint.

dundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). A defense is insufficient "if as a matter of law, the defense cannot succeed under any circumstances." *Hahn v. Best Recovery Servs., LLC,* 2010 WL 4483375, *2 (E.D.Mich. Nov. 1, 2010) (internal quotation marks and citations omitted). A Rule 12(f) motion is also proper "if it aids in eliminating spurious issues before trial, thereby streamlining the litigation." *Id.* (internal quotation marks and citation omitted). "Generally, however, a Rule 12(f) motion should not be granted if the insufficiency of the defense is not clearly apparent, or if it raises factual issues that should be determined on a hearing on the merits." *Id.* (internal quotation marks and citation omitted). Motions seeking to strike an affirmative defense are disfavored and should be used sparingly. As observed by the Sixth Circuit, a motion to strike "is a drastic remedy to be resorted to only when required for purposes of justice. The motion to strike should be granted only when the pleading to be stricken has no possible relation to the controversy." *Brown & Williamson Tobacco Corp. v. United States,* 201 F.2d 819, 822 (6th Cir.1953) (internal quotation marks and citations omitted).

### III.

Although the current round of briefing before the Court was set in motion by Deutsche Solar's Motion to Compel, Hemlock's Motion to Strike is analytically precedent. If Hemlock's motion succeeds in striking certain affirmative defenses from Deutsche Solar's answer, then Deutsche Solar would no longer have a ground on which to advance the relevance of its discovery request. Because of the posture of the motions, Hemlock's Motion to Strike will be considered first and then, if any of Deutsche Solar's affirmative defenses survive, its Motion to Compel will be taken up.

Hemlock attacks Deutsche Solar's affirmative defenses in two groups. First, Hemlock takes up Deutsche Solar's affirmative defense of illegality. The grounds for that illegality, according to Deutsche Solar, lie in European Union antitrust law. Deutsche Solar alleges that its contract with Hemlock violates EU antitrust laws and so should not be enforced by this Court. Hemlock answers this assertion in its motion to strike by claiming that illegality under foreign antitrust laws is not the type of illegality cognizable as an affirmative defense. As a result, Hemlock claims, the affirmative defense is legally insufficient and should be stricken.

Hemlock next challenges a series of Deutsche Solar's defenses, all of which are based in a single nucleus of facts. Deutsche Solar contends that their performance under the Supply Agreements was excused because of China's illegal intervention into the international solar market, which led to the decline and eventual collapse of the market. Deutsche Solar suggests that the risk associated with China's conduct is thus, appropriately, allocated to Hemlock. Hemlock responds that a price collapse is not a recognized basis for defenses to contract actions in Michigan and so the defenses related to that set of facts should be stricken.

### A.

The Supreme Court has twice addressed when a contract's illegality under antitrust laws and regulations can serve as an affirmative defense in a contract-enforcement action. The two opinions, in seeming conflict with each other, have engendered a great degree of discussion in the lower federal courts. The earlier of the cases, *Kelly v. Kosuga,* 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959), holds, at its broadest, that the illegality of a contract under federal antitrust laws does not serve

as a defense to a contract enforcement action. The later of the opinions, *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982), at its broadest, distinguishes *Kosuga* and holds that, under certain conditions, the illegality of a contract under federal antitrust law can furnish an affirmative defense of illegality.

Hemlock relies on the applicability of *Kosuga* to the current dispute. According to Hemlock, *Kosuga* bars Deutsche Solar from asserting its illegality affirmative defense. Hemlock reads *Kosuga* to hold that permitting the affirmative defense of illegality, where the illegality arises under antitrust laws, is the equivalent of a court enforcing antitrust laws. Enforcing EU antitrust laws is, Hemlock claims, something United States courts have refused to do on the grounds of international comity. Deutsche Solar, in response, argues that the interplay between *Kosuga* and *Kaiser Steel* is important to addressing Hemlock's motion. Deutsche Solar argues that *Kaiser Steel*, not *Kosuga*, controls the analysis in this case. After *Kaiser Steel*, the affirmative defense of illegality under antitrust laws is expressly permitted.

As discussed further hereafter, the reasons offered by Hemlock for why Deutsche Solar's affirmative defense of illegality should be stricken are without merit. There is, however, sufficient independent authority requiring that the defense be stricken. Specifically, *Kaiser Steel* and later cases foreclose the defense. For that reason, Hemlock's motion will be granted. The authority generated by *Kaiser Steel* and its conclusion that Deutsche Solar's affirmative defense cannot succeed will be analyzed first. Due to Hemlock's assertion of the interrelatedness of its argument and the grounds on which the affirmative defense will indeed be stricken, the alternative argument advanced by Hemlock will be addressed as well.

### 1.

The starting point in this analysis requires understanding the relationship between *Kosuga* and *Kaiser Steel*. *Kosuga* concerned two individuals involved in the onion trade. The respondent, Kosuga, brought suit against Kelly when Kelly "fail[ed] to complete payment of the purchase price of 50 cars of onions which the respondent had sold to the petitioner in December 1955." *Kosuga*, 358 U.S. at 516, 79 S.Ct. 429. "The petitioner interposed the defense that the sale was made pursuant to and as an indivisible part of an agreement which violated § 1 of the Sherman AntiTrust [sic] Act." *Id.* (internal statutory citations omitted). The petitioner was an onion grower who had purchased onions from the respondent in the past. The petitioner alleged that the basis of his agreement with respondent was a threat by respondent and respondent's business associate that they were in control of large quantities of onions and would flood the market (thus depressing prices) if onion growers such as the petitioner did not purchase from them. *Id.* at 517, 79 S.Ct. 429.

Eventually, the petitioner and other growers agreed to purchase a percentage of the respondent's onion store in exchange for the respondent agreeing not to flood the market. *Id.* The portion of the agreement applicable to the petitioner contemplated that the petitioner would purchase 50 cars of onions from the respondent. *Id.* at 518, 79 S.Ct. 429. The petitioner began making payments on that purchase but eventually fell into default and repudiated the agreement. *Id.* The respondent then brought suit for the unpaid purchase price (and the cost of storing the cars of onions of which the petitioner did not take physical possession). *Id.*

The concern expressed by the Supreme Court in *Kosuga* was for the potential of upsetting a contract dispute because an unrelated provision of the contract that may violate federal antitrust laws. *Id.* ("As a defense to an action based on contract, the plea of illegality based on violation of the Sherman Act has not met with much favor in this Court."). Thus, the Supreme Court held for the respondent in deciding that it would not nullify an agreement between the parties where the alleged violation of the Sherman Act was unrelated to the immediate transaction. *Id.* at 520–21, 79 S.Ct. 429. The Court wrote that "[p]ast the point where the judgment of the Court would itself be enforcing the precise conduct made unlawful by the Act, the courts are to be guided by the overriding general policy, as Mr. Justice Holmes put it, 'of preventing people from getting other people's property for nothing when they purport to be buying it.'" *Kosuga*, 358 U.S. at 520–21, 79 S.Ct. 429 (quoting *Cont'l Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227, 271, 29 S.Ct. 280, 53 L.Ed. 486 (1909) (Holmes, J. dissenting)).

*Kosuga* generated confusion in the lower federal courts because it did not completely foreclose the possibility that the affirmative defense of illegality could be sustained when it relates to illegality under antitrust laws. In *Kosuga*, the Court noted that it was only enforcing the agreed-upon sale of onions. *Id.* The Court held that it "c[ould] hardly be said to enforce a violation of the Act to give legal effect to a completed sale of onions at a fair price." *Id.* By contrast, "the nondelivery agreement between the parties could not be enforced by a court if its unlawful character under the Sherman Act be assumed." *Id.* That is, the Court would not be able to enforce a provision of the contract if the provision itself is unlawful under the Sherman Act. *Id.* Courts are not barred from enforcing a separable provision—in *Kosuga* the agreement to sell onions—merely because that provision appears in a contract alongside a provision that is unlawful under the Sherman Act. *Id.* Thus, *Kosuga* only holds that illegality under antitrust laws is not a defense when the illegality is not related to the transaction seeking to be enforced. 358 U.S. at 521, 79 S.Ct. 429.

When and under what circumstances an illegal promise contained in the sued-upon contract could be said to be sufficiently related to the promise seeking to be enforced, such that the two rise and fall together, was a question that was left unaddressed by *Kosuga*. The question was taken up twenty-three years later when *Kaiser Steel* was decided. As the Supreme Court explained:

> Respondents construe *Kosuga* as standing for two general propositions: first, that when a contract is wholly performed on one side, the defense of illegality to enforcing performance on the other side will not be entertained; and second, that the express remedies provided by the Sherman Act are not to be added to by including the avoidance of contracts as a sanction. It is apparent from the opinion in that case, however, that both propositions were subject to the limitation that the illegality defense should be entertained in those circumstances where its rejection would be to enforce conduct that the antitrust laws forbid. In *Kosuga*, there were two promises, one to pay for purchased onions and the other to withhold onions from the market. The former was legal and could be enforced, the latter illegal and unenforceable.

*Kaiser Steel*, 455 U.S. at 81–82, 102 S.Ct. 851 (footnotes omitted).

*Kaiser Steel* involved an agreement "between the United Mine Workers of America ("UMW") and hundreds of coal producers, including steel companies such as

petitioner Kaiser Steel Corp." *Id.* at 74, 102 S.Ct. 851. The agreement—the National Bituminous Coal Wage Agreement of 1974—"required signatory employers to contribute to specified employee health and retirement funds." *Id.* A subsection of the agreement "required employers to pay specified amounts for each ton of coal produced and for each hour worked by covered employees." *Id.* That subsection also "included a purchased-coal clause [that] requir[ed] employers to contribute to the trust specified amounts" for each ton of post-production coal that the employers acquired from other coal producers that had not already made UMW trust contributions on that coal. *Id.* at 74–75, 102 S.Ct. 851. In other words, if employers acquired coal that they did not produce, they had to pay specified amounts into the employee trust to compensate for the amounts they would have paid in if that coal had been produced by their own UMW workers.

Kaiser Steel Corporation "operate[d] a steel mill in California and coal mines in Utah and New Mexico. Its mines produce[d] only high-volatile coal, so it [had to] purchase mid-volatile coal used in steel manufacturing from another producer." *Id.* at 75, 102 S.Ct. 851. The employees of the producer from which Kaiser Steel purchased mid-volatile coal were not represented by UMW. *Id.* As a result, Kaiser Steel was required to "report the coal that it acquired from others or make contributions based on such purchased coal." *Id.* at 76, 102 S.Ct. 851. It did not. When the agreement between UMW and the coal producers expired, "the trustees of the UMW Health and Retirement Funds ... sued Kaiser seeking to enforce the latter's obligation to report and contribute with

respect to coal not produced by Kaiser but acquired from others." *Id.*

Kaiser Steel conceded that it violated the agreement "but defended on the ground, among others, that the agreement in these respects was void and unenforceable as violative of §§ 1 and 2 of the Sherman Act[.]" *Id.*[2] "Sections 1 and 2 of the Sherman Act prohibit contracts, combinations, and conspiracies in restraint of trade, as well as monopolization and attempts to monopolize." *Id.* at 78, 102 S.Ct. 851. According to Kaiser Steel, the purchased-coal clause was an unlawful restraint on trade "because it puts non-UMW producers at a disadvantage in competing for sales to concerns like Kaiser and because it penalizes Kaiser for shopping among sellers for the lowest available price." *Id.* at 78, 102 S.Ct. 851. Kaiser Steel argued that it would not be able to search the market for the most affordable post-production coal because non-UMW coal came with a market-distorting surcharge: the payment by Kaiser Steel of monies into the union funds. The district court and the court of appeals both "declined to pass on the legality of the purchased-coal clause under ... the Sherman Act." *Id.* at 78, 102 S.Ct. 851.

The Supreme Court reversed. First, the Court noted that, assuming the purchased-coal agreement were unlawful under the Sherman Act, a court could not enforce the related promise by Kaiser Steel to pay money into the UMW trust. *Id.* at 79, 102 S.Ct. 851. The UMW trustee argued that, in isolation, the requirement that Kaiser Steel, and other employers, pay money into the UMW trust is not illegal. *Id.* But the Court observed that "Kaiser ... did not make a naked promise to pay money to the union funds." *Id.* The

---

**2.** Kaiser Steel also argued that the agreement was illegal under the National Labor Relations Act, but the Court's adjudication of that argument is not germane to the present case so discussion of it has been omitted.

promise to pay money into the union funds under the purchased-coal agreement was inseparable from the conditions of contribution that offended the Sherman Act. "The purchased-coal provision obligated [Kaiser Steel] to pay only if it purchased coal from other employers and then only if contributions to the UMW funds had not been made with respect to that coal." *Id.* If a court directed Kaiser Steel to pay money into the union fund it would be "command[ing] conduct that assertedly renders the promise an illegal undertaking under the federal statutes." *Id.* at 79, 102 S.Ct. 851.

The Court next turned to an analysis of *Kosuga.* It rejected respondent Mullins' assertion that the case compelled a holding that Kaiser Steel's defense should be rejected. Rather, the *Kaiser Steel* court explained, *Kosuga* addressed a situation where there were two separate and distinct promises contained in a single contract. One promise "was legal and could be enforced, the [other] illegal and unenforceable." *Id.* at 82, 102 S.Ct. 851. The *Kosuga* court did not confront a situation where the promise being enforced would result in, at a minimum, the condonation of behavior offensive to the Sherman Act. The Court recognized that *Kosuga* did, however, note that such a situation was distinct from the facts before it:

> The [*Kosuga* ] Court went on to say that "[p]ast the point where the judgment of the Court would itself be enforcing the precise conduct made unlawful by the Act, the courts are to be guided by the overriding general policy . . . of preventing people from getting other people's property for nothing when they purport to be buying it."

*Kaiser Steel,* 455 U.S. at 80, 102 S.Ct. 851 (quoting *Kosuga,* 358 U.S. at 520–21, 79 S.Ct. 429) (internal quotation marks omitted). After making this observation, the Kaiser Steel court noted that *Kosuga* held

it was not "inappropriate or violative of the intent of the parties to give it effect even though it furnished the occasion for a restrictive agreement of the sort here in question." *Id.* at 80–81, 102 S.Ct. 851 (quoting *Kosuga,* 358 U.S. at 521, 79 S.Ct. 429). The Court in Kaiser Steel concluded its analysis of *Kosuga* by stating that "*Kosuga* thus contemplated that the defense of illegality would be entertained in a case such as this." *Id.* at 82, 102 S.Ct. 851.

Thus, by the time *Kaiser Steel* was decided, the question of when patent illegality in a contract could be used as a defense to a collateral contract provision was settled. If the provision is patently illegal and is not severable from the sued-upon provision, the defense of illegality is permitted. The next issue to be resolved, and one that is important for this case, is the types of illegality that are cognizable by the defense. Put differently, could something short of patent illegality substantiate the defense? While *Kaiser Steel* is helpful, it is not dispositive of situations where a sued-upon contract provision has an inextricably intertwined collateral obligation that is not patently illegal, but which could be illegal if certain conditions are met. Thus, could the conditions that would render that collateral obligation illegal be so certain to actualize that a court should permit the defense in light of *Kaiser Steel?*

That question confounds this case. Deutsche Solar contends that the illegality of the supply agreements under EU law is sufficient under *Kaiser Steel* to sustain their affirmative defense of illegality. But *Kaiser Steel* did not sweep so broadly. Indeed, the Court held: "Here, employer contributions to union welfare funds may be quite legal more often than not, but an agreement linking contributions to purchased coal, if illegal, is subject to the defense of illegality." *Id.* Thus, the Court specifically noted the direct linkage in the

substance of the agreement between the promise and the illegal condition. In *Kaiser Steel*, the infirmity was the actual linkage (with no concern for the propriety of the employer contribution payments), not the fact that employer contributions themselves could be illegal. That issue remained for another day.

Here, there is no patent illegality in the supply agreements. Rather, Deutsche Solar argues that if Hemlock meets certain market capitalization requirements the take-or-pay supply agreement would violate EU antitrust law. The District of Columbia Circuit addressed contracts that do not contain patent antitrust illegality in *National Souvenir Center, Inc. v. Historic Figures, Inc.*, 728 F.2d 503 (D.C.Cir.1984). That appeal arose out of "a series of pretrial rulings by the district court in three consolidated anti-trust cases involving wax museums[.]" *Id.* at 506. The origin of the dispute was an agreement between a wax museum in Washington, D.C. and a supplier of wax figures. *Id.* The supplier entered an agreement with the operating company "to provide the figures for the Washington museum and to assist in installing them in appropriate historical settings. In return, [the museum] agreed to purchase figures exclusively from [the supplier] and, for a five year period, to act as [the supplier's] sales agent to other wax museums." *Id.* at 506–07.

The museum began franchising museums throughout the United States. The first franchise was established by an agreement between the franchisee and a subsidiary of the original museum. *Id.* at 507. That agreement obligated the franchisor to provide the franchisee with figures from the supplier at cost and to furnish other services related to establishing the franchisee museum. *Id.* The franchisee contended that the franchisor also had to provide certain franchisor services over the life of the 20–year franchise agreement. *Id.* During that period the franchisee agreed to pay 5% of its annual gross receipts. *Id.*

The franchisor then established two more franchisee museums. *Id.* The agreements with these museums were similar in their required royalty payments. *Id.* The agreements varied, however, in how the franchisees would acquire wax figures. The second franchise did not acquire the figures through the franchisor but instead leased them directly from the supplier. The third franchise agreement did not specify how the museum would acquire wax figures.

The franchisee museums[3] eventually challenged the franchise agreements. They claimed that the agreements violated the Sherman Act because they impermissibly tied the supplier's figures to the museum franchise. *Id.* at 506. The second franchisee, the museum required to lease figures directly from the supplier, argued that the franchisor and its owner "unlawfully exercised their monopoly power in the wax figure market to require leasing rather than selling the figures." *Id.* "Upon filing suit, [the franchisees] stopped paying the franchise fees and rents required by the allegedly illegal agreements.

---

**3.** The opinion does not make clear whether only the first and second franchisees—the museums that were obligated to acquire wax figures from the franchisor or supplier, respectively—or all franchisees challenged the agreements. It would appear that only the first franchisee, or possibly just the first and second franchisee, would have standing to challenge the agreements since there is no reference in the opinion to the fact that the third franchisee's franchise agreement contained any requirements that the third franchise museum acquire wax figures from the franchisor or the supplier. While the opinion is not clear on this point, it is not material to the discussion of the District of Columbia Circuit's analysis.

Appellees then counterclaimed for recovery of overdue payments and interest." *Id.* at 506.

The franchisees defended against the franchisor and owners' contract counterclaim by alleging that the agreements were illegal tying agreements under the Sherman Act. The district court dismissed the franchisees' affirmative claims under federal antitrust laws because they were barred by the Clayton Act's statute of limitations. *Id.* at 509. The district court also granted summary judgment on the franchisor's contract counterclaim. *Id.* at 508–09. Despite dismissing the franchisees' affirmative antitrust claims as untimely, the district court analyzed the validity of their affirmative defense to the contract counterclaim of illegality under federal antitrust law. The district court concluded that, under *Kaiser Steel*, the defense could not be sustained because "the promise being sued on is not itself illegal under the antitrust laws, [and so] *Kaiser* did not require recognition of the defense." *Id.* at 508 (quoting opinion below) (internal quotation marks omitted). The District of Columbia Circuit affirmed the district court's dismissal of the franchisees' illegal tying claims as time-barred. The circuit court reversed the district court's ruling that the second franchisee's monopoly leasing claims—related to leasing the wax figures—were time barred. The court then turned to the issue of the contract counterclaim and the franchisees' defense of illegality.

Although the District of Columbia Circuit affirmed the dismissal of the franchisees' antitrust claims as untimely brought, the issue of the franchisees' affirmative defense of illegality was not mooted. The time bar on the antitrust claims was not a merits determination of the agreements' legality. Thus, it was possible for the franchisees to contend that even though their affirmative cause of action could not

be brought, a judgment in favor of the franchisor would still "require[.] a federal court to enforce an illegal contract and that result is contrary to the rule governing antitrust defenses recently laid down in *Kaiser Steel* [.]" *Id.* at 514. The district court had rejected the franchisees' affirmative defense because it "read [*Kaiser Steel*] as allowing antitrust defenses to contract suits only where the promise being sued on is itself illegal under the antitrust laws." *Id.* (quoting opinion below) (internal quotation marks omitted). The District of Columbia Circuit affirmed, albeit on a different rationale.

The circuit court analyzed the interplay between *Kosuga* and *Kaiser Steel* and concluded that "*Kosuga* was generally viewed as permitting antitrust defenses in only a very narrow class of contract suits, courts being understandably hesitant to interpose complex antitrust issues in a simple suit for breach of contract." *Id.* In fact, the District of Columbia Circuit was tasked with applying this rationale from *Kosuga* when it heard the first appeal of Kaiser Steel as it made its way to the Supreme Court. *See Mullins v. Kaiser Steel Corp.*, 642 F.2d 1302 (D.C.Cir.1980). In Mullins, the court "read *Kosuga* to limit antitrust defenses to situations where the requested enforcement was of agreements not to compete or other direct market restrictions, *that* made 'the court … a party to an anticompetitive scheme.'" *Nat'l Souvenir Ctr., Inc.*, 728 F.2d 503, 514–15 (D.C.Cir.1984) (quoting *Mullins*, 642 F.2d at 1310).

Since, in *Mullins*, "the promise to contribute to the welfare fund would not have directly impeded competition at that point in time[,]" enforcement by the court would not have made it a party to an antitrust violation. As such, the District of Columbia Circuit reasoned, *Kosuga* was not offended. *Id.* at 515. But the court ac-

knowledged that this understanding was corrected by *Kaiser Steel* when the Supreme Court allowed the defense to proceed: "[I]n permitting the defendant to raise its antitrust defense in [*Kaiser Steel*], the Court opened the window only a notch to antitrust defenses, i.e., it refused to enforce a promise to pay that was itself a mechanism to police anticompetitive conduct." *Id.* Thus, the question that courts must ask following *Kaiser Steel* is not simply whether the agreement to be enforced is illegal under federal antitrust laws (the *Kosuga* question) but whether the agreement to be enforced is itself a mechanism to enforce a collateral agreement or provision that violates federal antitrust laws.

In the case before it, the District of Columbia Circuit determined that "the promises to pay franchise fees in this case do not appear on their face to be primarily means to enforce the allegedly illegal tie-ins between the wax figures and start-up services." *Id.* Rather, they appeared to be merely consideration for goods and services, or nothing more than an inoffensive market transaction. *Id.* Importantly, the court held:

> To transform the contracts here into illegal tie-ins would require complex proof of monopoly power in the tying market and leverage of that power in the tied market. Even then, their vice would extend only to the amount that the agreed prices exceeded the fair value of the goods and services received and consumed—the portion of the prices that could be traced to the illegal practice. The complexity of proof and speculative nature of appellants' defenses seem to us to place them outside of the [*Kaiser Steel*] exception and clearly

within the ambit of disfavor for such defenses articulated in *Kosuga*. *Id.* at 515–16. Stated differently, not only was the promise the court was asked to enforce not illegal, fulfilling the promise did not force the franchisees to comply with another portion of the agreement that itself was illegal. Any illegality under a collateral provision of the agreement would only arise under the presence of specific market conditions external to the agreement and upon which the agreement does not rely.

■ The situation that Deutsche Solar alleges exists here is no different. Deutsche Solar does not claim that the market transactions contemplated under the agreements are inherently illegal under EU antitrust law.[4] Instead, Deutsche Solar claims that the agreements are illegal under EU antitrust law *if* Hemlock's market conduct transgresses certain EU-defined market conditions. As a result, it requests discovery on that point. But this is the exact type of "complex proof of monopoly power" that *National Souvenir* held to be outside the narrow exception to *Kosuga* that *Kaiser Steel* created. *National Souvenir*, 728 F.2d at 515. For Deutsche Solar's affirmative defense to be sustainable they would need to show that that the take-or-pay transaction requirement under the agreements was inherently offensive to antitrust laws (the *Kosuga* prohibition) or that it is inextricably intertwined with a provision that is offensive to antitrust laws (the *Kaiser Steel* prohibition) such that it operates as a means of enforcing the illegal collateral provision. Deutsche Solar has not made this claim.

Deutsche Solar only argues that the take-or-pay agreement—that is, the bare transaction requirement—would be offen-

4. These are the transactions whereby Deutsche Solar must pay for and take delivery of certain quantities of polycrystalline silicon or otherwise pay Hemlock the value of the agreed upon amount in the event it does not take delivery.

sive to EU antitrust laws if Hemlock's European market capitalization exceeds the size restriction in the EU's take-or-pay prohibition.[5] In that respect the present case is distinguishable from *Kaiser Steel* and *National Souvenir* because the illegality would be inherent in the very transaction Hemlock seeks to enforce. In *Kaiser Steel* and *National Souvenir,* the illegality was present in a collateral provision that is intertwined with the transaction to be enforced.

This is a distinction without a difference. First, neither *Kaiser Steel* nor *National Souvenir* held that a situation where contingent antitrust illegality is present in the enforceable transaction, rather than a collateral transaction, is outside the scope of *Kosuga.* Second, *National Souvenir* does specifically address such a situation. In *National Souvenir* the claim by appellants was that the franchise contracts were illegal tying agreements. The nature of a tying agreement is such that the act of purchasing the tying product forces the acquisition of the tied product. So in that case, as would be the case here, the primary transaction itself would be illegal. But the District of Columbia Circuit did not find that distinction to be of relevance to the *Kosuga–Kaiser Steel* inquiry since the agreements could not be said to be per se illegal tying agreements. It was the contingency of the illegality that drew the case within *Kosuga*'s prohibition. Here, the agreements are not per se illegal. The Supreme Court has determined that in such circumstances, the possibility of illegality, when that illegality resides in a violation of antitrust laws, cannot sustain an affirmative defense of illegality. Deutsche Solar's defense will be stricken.

**2.**

Rather than directly addressing the application of *Kosuga* and *Kaiser Steel* Hemlock proposes what it believes is an independent bar to Deutsche Solar's affirmative defense. Because this separate line of authority that Hemlock argues would lead to Deutsche Solar's affirmative defense being stricken Hemlock devotes no attention to the applicability of *Kaiser Steel.* But Hemlock's alternative argument rests on an interpretation of *Kelly v. Kosuga* which is less than compelling.

Hemlock relies on *Kosuga* for a narrower point, seemingly left undisturbed by *Kaiser Steel.* Hemlock asserts that, separate from any distinction made by *Kaiser Steel, Kelly v. Kosuga* stands for the proposition that permitting an affirmative defense of illegality under antitrust laws is the equivalent of enforcing antitrust laws. *Kosuga,* 358 U.S. at 520, 79 S.Ct. 429. *Kaiser Steel*'s holding, Hemlock proceeds, does nothing to upset this proposition. In fact, according to Hemlock, *Kaiser Steel* endorses it. 455 U.S. at 80–83, 102 S.Ct. 851.

In the present case the illegality alleged by Deutsche Solar is of an altogether different character than that considered in any case from the *Kosuga–Kaiser Steel* line because it arises under EU, not United States, antitrust law. Because permitting the affirmative defense of antitrust illegality is the equivalent of enforcing antitrust laws, Hemlock's argument runs, allowing Deutsche Solar's defense would be enforcing EU antitrust laws. And doing so is something from which United States courts have abstained for reasons of international comity. As a result, the application of *Kosuga* and *Kaiser Steel* need not be reached. If, in the first instance, this

---

**5.** The European Union's antitrust laws make it illegal for firms above a certain European market capitalization to enter into take-or-pay contracts. Treaty Establishing the European Community, Rome Treaty, March 25, 1957, Articles 81 & 82.

Court cannot, or will not, enforce foreign law that could purportedly govern the contracts, the outcome of the *Kosuga–Kaiser Steel* analysis would be unduly burdensome since the international comity issue would still need to be confronted.

Indeed, if the law is as Hemlock states, this principle from *Kosuga* would clearly pose a separate and distinct preliminary hurdle for Deutsche Solar's affirmative defense to clear. But *Kosuga* does not speak as clearly as Hemlock contends to the issue of whether permitting an affirmative defense actually places a court in a position equivalent to that of actively enforcing antitrust laws. In *Kosuga,* the Supreme Court wrote: "If the defense of illegality is to be allowed as a collateral method of enforcement of the antitrust laws, as the breadth of the petitioner's argument suggests, it must be said that his theory creates a very strange class of private attorneys general." *Kosuga,* 358 U.S. at 520, 79 S.Ct. 429. But this sounds as a hypothetical assumption in light of the arguments petitioner, Kelly, had made in support of his claim that his affirmative defense should be permitted. Indeed, the Court followed this remark and opened its next paragraph: "In any event, an analysis of the narrow scope in which the defense is allowed in respect of the Sherman Act indicates that the principle of distinction is not what the petitioner claims it to be." *Id.*

Nothing in the language of the *Kosuga* opinion supports Hemlock's assertion that the Supreme Court intended to, or did, hold that an affirmative defense of illegality grounded in the antitrust laws necessarily equates to enforcing antitrust laws. The Supreme Court was specifically addressing the manner in which Kelly was attempting to construe authority that addressed the affirmative defense of illegality. Kelly took the position those seemingly applicable prior cases actually involved defendants who were not a party to the illegal agreement nevertheless attempting to use the agreement's illegality against the plaintiff/seller. Here, Kelly claimed, he was a party to the illegal agreement and the illegal agreement bore at least some relation to the suit. Because of this distinction his defense should be sustained. *Id.* at 519, 79 S.Ct. 429.

But in the passage Hemlock cites, the Court was merely noting that Kelly's position would permit any party to allege, in defense of a contract action, that an agreement violated the antitrust laws as long as that agreement bore some cognizable factual relation to the dispute, even though the agreement was otherwise legally irrelevant to the claim. That was the very conclusion Kelly sought. While the transaction upon which *Kosuga* brought suit was contemplated by the same instrument that contained a provision that violated the Sherman Act, neither provision had any legal relevance to the enforcement of the other. Kelly still thought the agreement's illegality should sustain his affirmative defense. But, to support his affirmative defense Kelly proposed a rule even broader than necessary to apply to his own circumstance. His rule would have allowed a defendant to interpose a claim that some tangentially related agreement violated the antitrust laws. This would leave federal courts with what was actually an antitrust violation counterclaim lurking in the guise of an affirmative defense. The Court observed that permitting such a defense would be closer to deputizing private individuals as antitrust regulators than it would be an appropriate extension of the contract illegality defense. The Court was not articulating a general rule that entertaining an affirmative defense of antitrust illegality is always the equivalent of enforcing antitrust laws. Instead, it was actively warning against the adoption of the-

ories producing that result, such as the rule proposed by Kelly.

Thus, the starting-point for Hemlock's argument is without merit. Kosuga does not hold that by allowing an affirmative defense of illegality under antitrust law a court is essentially enforcing the antitrust laws. But, because there is an independent ground that requires Deutsche Solar's affirmative defense be stricken, the fact that Hemlock's argument is not meritorious is not fatal to its motion.

### B.

In further response to Deutsche Solar's Motion to Compel, Hemlock moves to strike a number of other contract defenses of Deutsche Solar's. Specifically, Deutsche Solar contends that it should be excused from performance of its contractual obligations, at least temporarily, because of the conduct of the Chinese government and the altered polycrystalline silicon market. Deutsche Solar manifested this theory as five distinct affirmative defenses:

12. Any required performance on the part of Deutsche Solar is excused by the doctrine of commercial impracticability.
13. Any required performance on the part of Deutsche Solar is excused by the doctrine of frustration of purpose.
14. Any required performance on the part of Deutsche Solar is excused by the doctrine of force majeure.
15. Any required performance on the part of Deutsche Solar is excused by the supervening intervention of one or more third parties.
16. Any required performance on the part of Deutsche Solar is excused by the illegal dumping of solar panels by the Chinese Government and Chinese producers, which caused a fundamental disruption in the market that was not foreseen or foreseeable by the parties at the time of their agreements.

ECF No. 14 at 12. Hemlock claims that all of these defenses are legally insufficient and should, like Deutsche Solar's illegality defense, be stricken.

### 1.

Hemlock, in its Motion to Strike, argues that Deutsche Solar's fourteenth affirmative defense of force majeure should be stricken because majeure is not a recognized contract defense under Michigan law. ECF No. 36 at 19. In its response, "Deutsche Solar concedes that the defense of force majeure is inapplicable and withdraws that defense[.]" ECF No. 53 at 1. The defense will be deemed withdrawn and need not be addressed.

### 2.

Hemlock's arguments for striking Deutsche Solar's defenses numbered twelve, thirteen, fifteen, and sixteen all relate to Deutsche Solar's assertion that "dumping" activities by China and possibly other third party actors caused objectively unforeseeable market disruptions that excuse its contractual performance. Accordingly, it claims that the risk of loss associated with China's conduct should be allocated to Hemlock. Hemlock counters that Deutsche Solar's theory is legally insufficient to substantiate any of these four excuses to performance, pled as affirmative defenses, and so they must be stricken. Hemlock, in its motion to strike, addressed defenses twelve, thirteen, and sixteen as a single group. Hemlock addressed defense fifteen separately and claims that "Supervening Intervention of Third Parties" does not exist as a defense under Michigan Law. ECF No. 36 at 20. But as Deutsche Solar construes the defense they contend that "intervention in the market by a third party may result in impracticability or frustration of purpose." ECF No. 53 at 20. Since Deutsche Solar does not

view illegal intervention in a market as a distinct excuse to contract performance, but instead a description of circumstances that give rise to a legally cognizable defense, it will be addressed in conjunction with defenses twelve, thirteen, and sixteen.

■ Hemlock contends that Deutsche Solar may not be excused because "deteriorating market conditions cannot, as a matter of law, satisfy the requirements of either impracticability of [sic: or] frustration of purpose." ECF No. 36. Deutsche Solar identifies impracticability and frustration of purpose as defenses twelve and thirteen. Defenses fifteen and sixteen, it alleges, describe factual circumstances that can establish impracticability and frustration of purpose. Indeed, "[t]he doctrines of frustration of purpose and supervening impossibility/impracticability are related excuses for nonperformance of contractual obligations and are governed by similar principles." *Liggett Rest. Grp., Inc. v. City of Pontiac*, 260 Mich.App. 127, 676 N.W.2d 633, 637 (2003). Thus, the central question presented by Hemlock's motion to strike is whether Michigan recognizes either one or both of those two defenses.

■ Hemlock argues that Michigan law does not recognize either of these defenses as excuses for contract performance when they are predicated on a change in market price for a product or the financial inability of a party to meet its commitments. ECF No. 36 at 16. Deutsche Solar counters that this principle gives way "in situations where a contracting party was the source of the frustrating event ... [or]⁶ where the frustrating event was the result of an action outside the contracting parties' control." ECF No. 53 at 20 (citations omitted). For a party to avail itself of the defense of frustration of purpose under Michigan law it must prove the following conditions:

(1) the contract must be at least partially executory; (2) the frustrated party's purpose in making the contract must have been known to both parties when the contract was made; (3) this purpose must have been basically frustrated by an event not reasonably foreseeable at the time the contract was made, the occurrence of which has not been due to the fault of the frustrated party and the risk of which was not assumed by him.

*Molnar v. Molnar*, 110 Mich.App. 622, 313 N.W.2d 171, 173 (1981). Deutsche Solar's claim, as currently pled, in less than clear particular terms, appears to be that the entry of China and the Chinese solar industry into the global solar market was not reasonably foreseeable when Deutsche Solar and Hemlock entered into the supply agreements. Deutsche Solar believes that it may be able to offer evidence that China's conduct and its impact on the market was completely unforeseeable and more than a simple market risk, even to a sophisticated industry participant.

■ Hemlock responds that asserting a defense of frustration of purpose and supervening impossibility/impracticability of performance fails as a matter of law when the argument supporting the defense is that a contracting party did not anticipate events having an impact on a product's price. While the facts Deutsche Solar currently contends support defenses twelve, thirteen, fifteen, and sixteen may not withstand later scrutiny, the consideration of such facts is inappropriate at this stage given the standard of review. Affirmative defenses, even if predicated on facts found insufficient or inadequate to withstand scrutiny on a dispositive motion, will only be stricken on a Rule 12(f) motion "when the pleading to be stricken

---

6. In its brief Deutsche Solar employs a disjunctive "and".

has no possible relation to the controversy." *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir.1953) (internal quotation marks and citations omitted). All that needs be demonstrated at this stage is that Michigan recognizes frustration of purpose and supervening impossibility/impracticability as excuses to contract performance and that the underlying controversy bears some relation to that defense. Presently, the ambit of review when considering a motion to strike is limited to the pleadings and documents incorporated therein. *See, e.g., Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir.1999) (explaining that affirmative defenses are subject to the same plain statement standards as the complaint but recognizing that simply naming affirmative defenses may be sufficient). The infirmities with the defense theory that Hemlock identifies depend on issues of fact "that should be determined on a hearing on the merits." *Hahn v. Best Recovery Servs., LLC*, 2010 WL 4483375, *2 (E.D.Mich. Nov. 1, 2010) (internal quotation marks and citations omitted). But such a determination would be premature when deciding a motion to strike. Hemlock's motion will be denied with respect to defenses twelve, thirteen, fifteen, and sixteen.

Deutsche Solar notes in its response to Hemlock's motion that its affirmative defense of impracticability also relates to its claims regarding illegality under European Union antitrust regulations. ECF No. 53 at 24. This argument has already been addressed, *supra* § III.A, and has been found to be without merit. Thus, Deutsche Solar's affirmative defense of impracticability is stricken to the extent it relates to illegality under EU antitrust laws or regulations.

## IV.

After resolving Hemlock's motion to strike, Deutsche Solar's motion to compel may now be properly considered. In its motion Deutsche Solar moves this Court to compel the production of answers to interrogatories and documents requested by Deutsche Solar of Hemlock. Deutsche Solar believes that this information is relevant or could reasonably lead to the discovery of material relevant to its affirmative defenses and legal theories that correspond to those defenses. ECF No. 30.

 Parties are permitted under Federal Rule of Civil Procedure 37 to move for an order compelling disclosure or discovery. "The Federal Rules of Civil Procedure are in place to facilitate discovery of all relevant evidence. Rule 26 authorizes a broad scope of discovery, provided the material sought has some probative value in proving or disproving a claim or defense." *Gamby v. First Nat'l Bank of Omaha*, 06–11020, 2009 WL 963116 (E.D.Mich. Apr. 8, 2009) (citing FED. R. CIV. P. 26(b)(1)).

## A.

Because Deutsche Solar's affirmative defense of illegality and its affirmative defense of impracticability relating to the Supply Agreements violating EU antitrust laws will be stricken, Deutsche Solar's corresponding discovery requests will be denied. Deutsche Solar's motion to compel will also be denied with respect to Hemlock's general objections concerning Deutsche Solar's EU antitrust theory. ECF No. 30 at 5–6. Finally, Deutsche Solar's motion to compel will also be denied with respect to its Second Interrogatory No. 1, Second Interrogatory No. 2, and Second Request for Production No. 1, which all seek European market-share information. ECF No. 30 at 6–11.

## B.

By contrast, Deutsche Solar's motion to compel will be granted with respect to the

information it seeks pertaining to its general contract defenses and its theory that a third party, China, rendered its performance under the Supply Agreements impracticable. Specifically, Deutsche Solar requests the production by Hemlock of

... all documents submitted by or on behalf of Hemlock in the trade proceeding before the People's Republic of China's Ministry of Commerce ... referenced in a letter from Hemlock to Deutsche Solar ... that refer, reflect, or relate to Deutsche Solar or any of its affiliates or to any agreement between the parties.

ECF No. 30 at 11.

Hemlock contends that "a review of [its] production shows that these requested documents have been produced in response to other requests." ECF No. 37 at 14. Deutsche Solar responds by claiming that Hemlock did not produce the documents they seek but instead "produced a list of documents maintained in a data room and, apparently, copies of certain schedules it provided [the Chinese Ministry of Commerce.]" ECF No. 46 at 5. To avoid the difficulties that this disagreement could pose, Hemlock will be directed to produce the documents consistent with those materials sought by Deutsche Solar in its Second Request for Production No. 2.[7]

### C.

Lastly, Deutsche Solar seeks to compel Hemlock's quarterly and annual financial statements from January 1, 2005 to December 31, 2013. "Deutsche Solar believes that the financial statements contain information related to Hemlock's claim for

damages and to its decision to terminate the contracts, an act that Deutsche Solar contends was made in bad faith." ECF No. 30 at 16. Deutsche Solar believes that "Hemlock's decision to terminate the contracts was motivated by financial concerns and not by any breach on the part of Deutsche Solar" and that Hemlock's financial statements evidence this ulterior motive. *Id.*

Hemlock, however, argues that Deutsche Solar's request for this information was untimely and should be denied. Deutsche Solar argues that its first Request for Production was sufficiently specific to encompass all of Hemlock's financial statements that it now seeks to compel. That Request reads, in relevant part:

3. All Documents and Communications Concerning, Referring or Related to (i) the negotiation, execution, or amendment of the Supply Agreements; (ii) Deutsche Solar's performance or nonperformance under the Supply Agreements; and (iii) Deutsche Solar's purchase of Product under the Supply Agreements.

6. Copies of all Documents relating to all sales and deliveries of silicon by Hemlock to Deutsche Solar from the inception of the Supply Agreements to date.

13. All Documents that support the damages claimed by Hemlock.

ECF No. 37 at 12. Nothing in these requests can be read as specifically relating to financial statements of Hemlock that are unrelated to its dealings with Deutsche Solar. Hemlock represents in its response

---

7. Hemlock briefly makes a subsidiary argument in its response to Deutsche Solar's Motion to Compel that "if there remains something that Deutsche Solar wants, the request is improper, because it has no viable defense premised on the 'trade cases.'" ECF No. 37 at 14. To the extent that this argument mirrors Hemlock's argument in its motion to strike it is either meritless or premature. In either event, Deutsche Solar's request is, at this stage, relevant to its affirmative defenses.

to Deutsche Solar's motion that the unproduced financial statements "contain no references to Deutsche Solar, any amounts paid by Deutsche Solar, or the Supply Agreements." ECF No. 37 at 12.

Hemlock further claims that to the extent the request can be considered, the financial statements have no bearing on the contract dispute since the Supply Agreements were "take or pay" contracts. ECF No. 37 at 12–13. The "take or pay" nature of the Agreements means that no reference needs to be made to Hemlock's financials to make a damage determination; the damages are evident on the face of the Agreements.

Deutsche Solar believes that the issue of damages is more nuanced. It has made, it claims, "millions of dollars in prepayments" which will only be apparent on review of Hemlock's financial statements. ECF No. 30 at 16. If this is the case, however, it is not clear how Deutsche Solar's own accounting records would not be an equally adequate point of reference for quantifying those prepayments.

As final reason for why the documents should be produced Deutsche Solar claims that Hemlock terminated the Supply Agreements in bad faith because it was experiencing financial hardship. ECF No. 30 at 16. Deutsche Solar does not explore this argument and states only that "[t]he financial statements ... will show that Hemlock's decision to terminate the contracts was motivated by financial concerns and not by any breach on the part of Deutsche Solar." *Id.* But Deutsche Solar does not explain how the financial statements can themselves prove Hemlock's corporate motivation or even that they might reasonably lead to information that forms such proofs.

Since Deutsche Solar does not advance a theory that supports the production of Hemlock's remaining financial statements from the period of January 1, 2005 to December 31, 2013, Deutsche Solar's motion will be denied as to those materials.

## V.

The last matter to be addressed is a motion for leave to file an amended answer, filed by Deutsche Solar on February 19, 2015. ECF No. 56. Deutsche Solar seeks to amend its answer to incorporate a counterclaim for declaratory relief. *Id.,* Ex. A. It claims that this amendment should be granted because it adds nothing to what was not already plain on the face of their affirmative defenses. Hemlock argues that the motion should be denied because it would cause them undue prejudice and Deutsche Solar should have availed itself earlier of the ability to amend if it indeed knew all facts pertinent to its counterclaim.

A court should "freely give leave" to amend "when justice so requires." FED. R. CIV. P. 15(a)(2). "Undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment are all factors which may affect the decision." *Hageman v. Signal L.P. Gas, Inc.,* 486 F.2d 479, 484 (6th Cir.1973). "Delay by itself is not sufficient reason to deny a motion to amend." *Id.* A court must also evaluate the notice and possible prejudice to the opposing party when considering whether to permit amendment. *Id.* "Decisions as to when justice requires amendment are left to the sound discretion of the trial judge[.]" *Robinson v. Michigan Consol. Gas Co., Inc.,* 918 F.2d 579, 591 (6th Cir.1990).

Deutsche Solar's amendment will not be allowed. Although no dispositive action has been taken by the parties, discovery has long been closed. The disposition of the motions adjudicated in this

opinion will require reopening discovery, but that will be done only for a limited purpose. While Deutsche Solar believes that Hemlock will not require discovery to defend against its proposed declaratory judgment action. But permitting a late pleading that has the effect of transforming a party from a plaintiff fielding affirmative defenses to defending a claim for declaratory relief—relief which, if successful, could lead to a judgment in the amount of $100 million—bespeaks prejudice. If the case were in its infancy, the prejudice would be minimized by the exploratory posture of the parties. By now, the legal theories and tactics employed by the parties should be known.

Furthermore, Deutsche Solar admits that its legal theories and tactics have been known: it claims that this counterclaim differs from its affirmative defenses only in the relief sought. This, it claims, should have had Hemlock on notice from the day Deutsche Solar first filed its Answer and Affirmative Defenses. But the inverse is true. While Deutsche Solar's Answer may have put Hemlock on notice of a possible counterclaim for return of the prepayments made on the agreements, the excess of eighteen months that have passed since that time have had the opposite effect.

This is not a situation where Deutsche Solar attempts only to "remedy pleading deficiencies" or refine its arguments. *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 626 (6th Cir.2002). Instead, it seeks to add an altogether new claim and fundamentally alter the adversarial posture of the parties. *See id.* (expressing concern with late amendments that sought to incorporate new claims). Such an amendment will not be permitted at this stage in the litigation. Deutsche Solar's motion will be denied.

## VI.

Accordingly, it is **ORDERED** that Plaintiff Hemlock's Motion to Strike, ECF No. 36, is **GRANTED in part** and **DENIED in part.**

It is further **ORDERED** that Defendant Deutsche Solar's Affirmative Defense No. 6, ECF No. 14, is **STRICKEN.**

It is further **ORDERED** that Defendant Deutsche Solar's Motion to Compel, ECF No. 30, is **GRANTED in part** and **DENIED in part.**

It is further **ORDERED** that Plaintiff Hemlock is **DIRECTED** to produce all documents relevant and responsive to Defendant Deutsche Solar's requests relating to its defenses that rely on the theory of the illegal market intervention of a third party.

It is further **ORDERED** that these productions be completed **on or before May 29, 2015.**

It is further **ORDERED** that the discovery cutoff in this matter is adjourned until **May 29, 2015** for the limited purpose of completing the transfer of documents outlined in this order.

It is further **ORDERED** that Defendant Deutsche Solar's Motion for Leave to Amend, ECF No. 56, is **DENIED.**

It is further **ORDERED** that the parties are **DIRECTED** to submit to the Court, through the utilities function of CM/ECF or via facsimile, proposals for the scheduling of currently adjourned dates in this matter.